IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 9, 2019 Session

## DONREIL A. BORNE v. CELADON TRUCKING SERVICES, INC.

**Appeal from the Circuit Court for Shelby County**
**No. CT-003273-10  Robert Samuel Weiss, Judge**

_____

**No. W2018-01645-COA-R3-CV**

_____

The Tennessee Supreme Court remanded this matter to the trial court for a more definite statement as to the grounds for remittitur.  The Court specifically noted that "the trial court's failure to indicate the reasons for its suggested remittitur leaves us unable to determine whether the evidence preponderates against the remittitur and, consequently, unable to conduct a proper appellate review of the trial court's remittitur decision."  The trial court responded, *inter alia*, that the plaintiff had improved his ability to lift and engage in repetitive activities, and that this proof, along with the plaintiff's success at rehabilitation, strong work ethic, and desire to support his family, led the court to find that the plaintiff "will have some future income over the next 38 years which is the basis for reducing the loss of earning capacity from $1,455,000 to $1,100,000."  We find that a preponderance of the evidence does not support the decision of the trial court to remit the judgment to $1,100,000, and we, therefore reverse the judgment. We further find that based on the proof in the record that the judgment for loss of earning capacity damages should be remitted to $1,334,647.  We, therefore, remit the jury's verdict for loss of earning capacity damages to $1,334,647.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN and KENNY ARMSTRONG, JJ., joined.

R. Sadler Bailey, Thomas R. Greer, and J. Vance Montgomery, Memphis, Tennessee, for the appellant, Donriel A. Borne.

James B. Summers, Kevin W. Washburn, and John R. Hensley, Memphis, Tennessee, for the appellee, Celadon Trucking Services, Inc.

## OPINION

### I.  BACKGROUND

This action arose following a July 1, 2009, accident on Interstate 55 in Memphis involving three tractor-trailers.  The plaintiff, Donriel A. Borne, was driving the first tractor-trailer owned by Trimac Transportation South, Inc. ("Trimac").  After traffic began to slow and eventually stopped, Harold L. Foster, driving a tractor-trailer owned by Celadon Trucking Services, Inc. ("Celadon") rear-ended the rig being driving by Borne.  The Celadon truck was then rear-ended by a tractor-trailer owned by Chickasaw Container Services, Inc. ("Chickasaw") and driven by Steve Dondeville.  According to Borne, he suffered "severe and permanent injuries" to his back and neck as a result of the traffic accident.

On June 30, 2010, Borne filed a complaint against Foster, Celadon, Dondeville, and Chickasaw.  Prior to trial, Foster, Dondeville, and Chickasaw were dismissed as parties to the lawsuit.  The lawsuit ultimately involved only Borne and Celadon.

After the May 2013 trial, the jury returned a verdict in Borne's favor, awarding him $3,705,000 in total damages.  The jury's award for loss of earning capacity was $1,455,000.[1]  Upon motion by Celadon, the trial court suggested a remittitur based upon its determination that the award was "excessive" and reduced the jury's award for loss of earning capacity by $355,000 to $1,100,000.  The trial court also suggested a remittitur for the jury's awards for physical pain and mental suffering, permanent injury, and loss of enjoyment of life;[2] those awards, however, are not at issue in this appeal.

Borne accepted the suggestion of remittitur under protest.  "When the trial judge suggests a remittitur, the plaintiff has three options:  accept the remittitur, refuse the remittitur and opt for a new trial, or accept the remittitur under protest and seek relief from the Court of Appeals."  *Meals ex rel. Meals v. Ford Motor Co.,* 417 S.W.3d 414, 421-22 (Tenn. 2013) (citing Tenn. Code Ann. § 20-10-102(a)).

Upon the action being appealed to the Tennessee Court of Appeals, this court reversed the trial court's remittitur of the award for loss of earning capacity and reinstated the jury's award of $1,455,000.  We "found no basis for straying from the lost earnings

---

[1] The jury also awarded $750,000 for physical pain and mental anguish, $750,000 for loss of enjoyment of life, and $750,000 for permanent injury.

[2] The trial court reduced the physical pain and mental anguish by $250,000, loss of enjoyment of life by $350,000, and permanent injury by $650,000.

figure suggested by Dr. Gamboa."[3]  The total award to Borne upon our review was $2,105,000.  *Borne v. Celadon Trucking Servs.,* No. W2013-1949-COA-R3-CV, 2014 WL 3778743, at *18-33 (Tenn. Ct. App. July 31, 2014).

Upon granting review, the Tennessee Supreme Court determined that the trial court did not provide sufficient explanation of the reasons for its suggested remittitur to afford meaningful appellate examination.  The Court vacated our decision to reverse the trial court's remittitur of the loss of earning capacity award, reversed the additional remittitur of the loss of enjoyment of life award, and remanded the case to the trial court.  The Court noted specifically:  "As is the case for this Court, the Court of Appeals had no explanation of the trial court's reasons for its suggestion of remittitur, so it did not have enough information to perform a meaningful review of the trial court's decision to suggest a remittitur of the award for lost earning capacity."  *Borne v. Celadon Trucking Servs.*, 532 S.W.3d 274, 318 (Tenn. 2017).

The Supreme Court observed as follows regarding remittitur:

> The current remittitur statute, Tennessee Code Annotated section 20-10-102, . . . refers to the trial court's authority to suggest a remittitur "when the trial judge is of the opinion that the verdict in favor of a party should be reduced. . . ." Tenn. Code Ann. § 20-10-102(a).  In 1987, the legislature added the following language to subsection (b) of that statute:  "The court of appeals shall review the action of the trial court suggesting a remittitur using the standard of review provided for in T.R.A.P. 13(d) applicable to decisions of the trial court sitting without a jury."  Tenn. Code Ann. § 20-10-102(b). The provision in Rule 13(d) of the Tennessee Rules of Appellate Procedure to which section 20-10-102(b) refers states:  "[R]eview of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise."  Tenn. R. App. P. 13(d).  Taken altogether, these indicate that the legislature intended for trial courts to have the authority to grant remittitur if the trial judge finds that the evidence preponderates in favor of a lower amount of damages than the jury awarded.

---

[3] The trial court's remittitur for physical pain/mental anguish and permanent injury was upheld.  We ordered a remittitur of an additional $350,000 to the loss of enjoyment of life award, down to $50,000.

Thus, over time, trial courts have acquired broader authority to suggest a remittitur. A trial court is no longer required to find that the amount of a jury's verdict is so excessive as to indicate passion, prejudice, corruption, or caprice on the part of the jury. A trial judge may suggest an adjustment in a jury verdict even when the amount of the verdict is within the range of reasonableness, i.e., is supported by material evidence in the record. After seeing the witnesses and observing their demeanor, the trial court is "to independently weigh the evidence, pass upon the issues, and decide whether the verdict is supported by the evidence." *Moats*, 906 S.W.2d at 433. After making his own independent assessment of the witnesses' credibility, if the trial judge finds that the evidence preponderates in favor of a lower amount of damages, the trial judge may suggest remittitur instead of granting a new trial.

Concomitantly, under section 20-10-102(b), the standard of appellate review for a *trial court's* suggestion of remittitur requires the appellate court to ascertain whether the trial judge's reduction of the jury award is supported by a preponderance of the evidence.

In applying the preponderance of the evidence standard to its review of the trial court's suggested remittitur, we note that the appellate court must "giv[e] due credit to the jury's decision on the credibility of the witnesses and that of the trial judge in his capacity as thirteenth juror." *Foster [v. Amcon Int'l, Inc.]*, 621 S.W.2d [142,] 145 [(Tenn. 1981)]. . . .

Applying this standard of review, in *Long v. Mattingly*, then-Judge Koch offered "a three-step review of a trial court's adjustment of a jury's damage award." *Long v. Mattingly*, 797 S.W.2d 889, 896 (Tenn. Ct. App. 1990). The suggested framework consisted of the following:

First, we examine the reasons for the trial court's action since adjustments are proper only when the court disagrees with the amount of the verdict. Second, we examine the amount of the suggested adjustment since adjustments that totally destroy the jury's verdict are impermissible. Third, we review the proof of damages to determine whether the evidence preponderates against the trial court's adjustment.

*Id.* (citations and internal quotation marks omitted). We adopt the *Long v. Mattingly* three-prong framework for appellate review of a trial court's suggested remittitur.

The primary purpose of the first *Long v. Mattingly* prong, looking at the trial court's stated reasons for the adjustment, is to determine whether the trial court "disagreed with other than the amount of the verdict." *Burlison v. Rose*, 701 S.W.2d 609, 611 (Tenn. 1985). While the trial court's denial of the motion for new trial is some indication that the trial judge agreed with the jury as to the defendant's liability, we look at the trial court's actions overall to determine whether "the trial judge disagreed with the facts as found by the jury." *Id.*

The second prong requires the appellate court to determine whether the trial court's suggested . . . remittitur "totally destroys" the jury's verdict. *Long*, 797 S.W.2d at 896. In making this determination, there is no set mathematical formula or percentage to use. *Meals*, 417 S.W.3d at 420 n. 8. Appellate courts have at times looked at whether the . . . remittitur "would result in an award not only proportionally different from the jury verdict but also substantially different in absolute terms." *Bonner [v. Deyo*, No. W2014-00763-COA-R3-CV], 2014 WL 6873058, at *7 [(Tenn. Ct. App. Dec. 5, 2014)] (quoting *Phillips v. Perot*, No. 02A01-9704-CV-00094, 1998 WL 117325, *4 (Tenn. Ct. App. Mar. 17, 1998) (Lanier, Sp. J., concurring)).

For the third prong of the three-step review, we look at the proof to ascertain whether the evidence preponderates against the trial court's . . . remittitur. As noted above, this prong requires us to defer to the jury's decision on the credibility of the witnesses and also to "that of the trial judge in his capacity as thirteenth juror." *Foster*, 621 S.W.2d at 145.

As we segue into applying this three-step framework to review the trial court's suggestion of remittitur in this case, we immediately encounter an obstacle. The first step is to "examine the reasons for the trial court's action." *Long*, 797 S.W.2d at 896. In this case, to explain the decision to grant remittitur, the trial court's Order Denying Defendant Celadon

Trucking Services Inc.'s Motion for New Trial and Granting Remittitur states only the following: "[W]hile this Court makes no specific determination that this jury acted with passion, prejudice or caprice, it is ruled that the award given following the trial of this matter was excessive and remittitur is appropriate." . . . Thus, to explain its substantial suggested remittitur of the jury's verdict, the trial court stated only that the jury's award was "excessive" and remittitur was "appropriate." This offers virtually no insight into the reasons for the trial court's decision.

***

A trial court's failure to provide reasons for its suggestion of remittitur can also affect the appellate court's ability to apply the third prong of the *Long v. Mattingly* framework, the review of the proof to determine whether the evidence preponderates against the trial court's adjustment. This prong requires the appellate court to evaluate the preponderance of the evidence, giving proper deference to both the jury and to the trial judge in his capacity as thirteenth juror. . . . [I]f the evidence regarding damages was conflicting and required both the jury and the trial court sitting as thirteenth juror to assess the credibility of the witnesses, a trial court's failure to explain the basis for its suggestion of remittitur may leave the appellate court in the dark as to whether, or how, the trial court's view of the credibility of the witnesses may have differed from that of the jury.

***

If the trial court's authority to suggest remittitur were limited to situations in which the jury's award exceeds the range of reasonableness, explanation of the reasons for the remittitur would rarely be needed; the appellate court could simply review the record and assume credibility determinations that favor the award, in the same way that an appellate court reviews a jury verdict. However, because trial courts now have expanded authority to suggest remittitur based on the preponderance of the evidence, they also have the responsibility to explain the reasons for a remittitur. This is necessary to give the appellate court the baseline information needed to determine whether the evidence preponderates

- 6 -

against the remittitur. . . . Where credibility is a significant issue, deference to the trial court as thirteenth juror may not be possible without some idea of whether or in what regard the trial court's assessment of the witnesses' credibility differed from that of the jury. Under these circumstances, the appellate court may be left unable to review the evidence to determine whether it preponderates against the suggested remittitur. *See [State v.] Ellis*, 453 S.W.3d [889, ] 900 [(Tenn. 2015)] ("Weight and credibility, therefore, are inextricably linked."). In such cases, the appellate court has the option of remanding the case to the trial court for a proper explanation of the reasons for the suggested remittitur, including the trial court's assessment of the credibility of witnesses whose testimony was pertinent to the damage award.

As noted above, in the instant case, the trial court's order offered essentially no explanation for its decision to suggest remittitur in every category of damages awarded by the jury. . . .

***

… [T]he parties presented sharply contrasting testimony. The testimony conflicted regarding Mr. Borne's physical condition, the degree to which his injuries were caused by the July 2009 accident, whether Mr. Borne could secure employment, and, if so, whether such employment would provide earnings equal to what he was making prior to the accident.

… **The[] awards indicate that the jury credited the testimony of Mr. Borne's witnesses and did not credit the testimony of the witnesses presented by Celadon.**

The trial judge suggested remittitur of the jury's award down to the following amounts: $1,100,000 for loss of earning capacity, $500,000 for physical pain and mental suffering, $100,000 for permanent injury, and $400,000 for loss of enjoyment of life. Each of these categories of damages would be affected to some extent by the perceived credibility of the witnesses who testified regarding Mr. Borne's physical condition, the degree to which his injuries were caused by the

- 7 -

July 2009 accident, whether Mr. Borne will be able to find suitable employment in the future and, if so, whether that employment will pay an amount equal to what he was making prior to the accident.

"Deciding whether there are inconsistencies in testimony, reconciling conflicts in testimony, and how this might affect a witness's credibility, are all within the province" of both the jury and the trial judge sitting as thirteenth juror. *State v. Hornsby*, 858 S.W.2d 892, 895 (Tenn. 1993). Sitting as thirteenth juror, the trial court is "free to believe or disbelieve all or part or none of a witnesses' testimony, even where the testimony is uncontradicted or is not directly impeached." *Cornell v. State*, 118 S.W.3d 374, 378 (Tenn. Ct. App. 2003). From the record in this case, without resorting to sheer speculation, we have no way to determine whether the trial court's suggested remittitur stemmed from disagreement with the jury regarding the credibility of the testimony on Mr. Borne's physical condition, the degree to which his injuries were caused by the July 2009 accident, whether Mr. Borne will be able to secure employment in the future, the likely amount of compensation Mr. Borne would be able to earn if he succeeds in finding a job, or whether the trial court's disagreement with the jury was based on some other factor entirely**.** In short, we are left unable to review where the preponderance of the evidence lies, "giving due credit to the jury's decision on the credibility of the witnesses and that of the trial judge in his capacity as thirteenth juror." *Foster*, 621 S.W.2d at 145.

Under these circumstances, we are left little choice but to remand the case to the trial court for an explanation of its reasons for suggesting remittitur in this case to enable the appellate court to conduct a proper appellate review of the trial court's remittitur decision. The trial court's explanation need not be exhaustive, but it should indicate the areas in which it disagreed with the jury, including disagreement with any factual findings underlying the jury's verdict or with testimony apparently credited by the jury.

*Borne*, 532 S.W.3d at 310-317 (bold and underline emphasis added).

- 8 -

As relevant to the remittitur issue, the Supreme Court summarized the following trial court testimony:

> Mr. Borne described the progression of his symptoms and his overall treatment. He outlined his decision to seek treatment from his family physician for low back pain while continuing to drive the tractor trailer, and his decision six months later to file a workers' compensation claim. After the workers' compensation physician restricted him to light-duty work and recommended that he see his own doctor, Mr. Borne said, his attorney referred him to neurosurgeon Dr. Dietze.
>
> Mr. Borne described how his injuries had affected his ability to work, engage in hobbies, and do normal activities. He enjoyed driving a truck; he missed being a truck driver and being able to earn a living. Before the accident, he had enjoyed hunting and fishing. Since his injury, Mr. Borne said, he can fish only if his wife helps him get his boat in and out of the water, and when he goes hunting, he sits in a chair in the woods. He said that he does yard work and household chores if he is able, but sometimes he is not able. Mr. Borne has not worked since the Celadon accident and has instead drawn workers' compensation benefits. His inability to work has left him depressed and worried about how he will pay his living expenses.
>
> …
>
> Mr. Borne agreed that the physical therapy with Dr. Roberts, completed in April 2012, had improved his functionality to the point that he could lift a twenty-five pound box. The improvement from the physical therapy allowed Mr. Borne to reduce his intake of anti-inflammatory medication and muscle relaxers to the point that he only took them when he overdid activities. He said that he does home exercises, walks on a treadmill, and he and his wife walk every other day. Despite this, Mr. Borne said it was his understanding that Dr. Dietze had not released him to do even sedentary work.
>
> Mr. Borne's wife, Tamara Williams, corroborated his testimony. Before the accident, she said, Mr. Borne was a hard worker and a "handy" person who did yard work and things around the house, and he also helped his mother. After

the accident, it upset Mr. Borne to no longer be able to work or to help her and his mother the way he did before the accident; Ms. Williams described Mr. Borne as depressed. She agreed that Mr. Borne's functionality improved when he did physical therapy with Dr. Roberts.

At trial, Mr. Borne's neurosurgeon Dr. Dietze testified to a reasonable degree of medical certainty that Mr. Borne had suffered a permanent musculoskeletal injury as a result of the July 1, 2009 accident. Dr. Dietze first detailed his course of treatment for Mr. Borne. In 2012, Dr. Dietze perceived that Mr. Borne's pain increased between 2011 and 2012, so he ordered an updated MRI and compared the MRI taken in 2010 with the one taken in 2012. He said that the comparison showed an accelerated degeneration of Mr. Borne's L4-5 disc beyond what would normally occur as part of the aging process. He felt that the most logical explanation for the accelerated degeneration was an injury to the L4-5 disc in the July 1, 2009 accident.

…

Dr. Dietze said he did diagnostic tests on Mr. Borne that indicated that his pain and functionality would benefit from a rhizotomy, a burning of certain nerve endings, and they were seeking approval for the procedure from the workers' compensation carrier.[4] He noted that, at the time physical therapist Dr. Roberts performed the 2011 functional capacity evaluation he ordered, Mr. Borne was not capable of performing sedentary work. After Mr. Borne completed the physical therapy Dr. Roberts recommended, his functionality improved. However, Dr. Dietze did not order an updated functional capacity evaluation. Dr. Dietze was asked what kind of work Mr. Borne would be able to do if the recommended rhizotomy were successful; Dr. Dietz noted that the physical therapy with Dr. Roberts went very well and that the therapist had documented improved strength and functionality. He then said, "I do think he could at least meet the sedentary, and I would say light – possible light duty, somewhere in that range."[5]

---

[4] The procedures were not approved.

[5] According to Borne, without the intense therapy regimen with Ms. Roberts, his pain

- 10 -

Radiologist Dr. Glorioso testified about his interpretation of the MRI performed on Mr. Borne in March 2012. After viewing the MRI, Dr. Glorioso opined that Mr. Borne had suffered an annular fibrosis tear, a disc herniation at the L4-5 level, bulging discs at the L2-3 and L3-4 levels, and signs of facet arthrosis, which is consistent with a degenerative spinal problem. Dr. Glorioso said that the annular fibrosis tear could be a pain generating source, and the herniation at L4-5 was consistent with trauma and was likely a pain generating source.

Physical therapist Dr. Roberts testified as well. She outlined her procedure for performing the functional capacity evaluation in late May and early June 2011. At that time, she concluded that Mr. Borne was "not quite capable of performing sedentary work activities," the lowest level of work activities, involving sitting for most of the time with occasional periods of walking or standing. At the conclusion of the functional capacity evaluation, Dr. Roberts recommended further physical therapy for Mr. Borne.

Dr. Roberts testified that, from October 2011 to April 2012, Mr. Borne underwent the extensive physical therapy she had recommended for him. Dr. Roberts said that the physical therapy resulted in significant improvement in Mr. Borne's functionality. By April 2012, Mr. Borne reported that his pain levels had improved, down at times to only a 2 on a scale of 10. He as able to fish, cook, carry a cooler filled with shrimp, lift twenty-five pounds, and walk and stand for over two hours at a strawberry festival. He took medication for his pain mainly on the weekends when he overdid activity. Mr. Borne increased his activities around the house, improved his gait, and enhanced his ability to walk long distances. At the conclusion, Dr. Roberts released Mr. Borne to continue exercise and physical therapy on his own.

Dr. Roberts was not asked to update her June 2011 functional capacity evaluation after Mr. Borne completed the recommended round of physical therapy. However, at the time of trial, based on her observations of Mr. Borne during

returned.

physical therapy, it was Dr. Roberts' opinion that Mr. Borne had improved to the point that he could probably perform sedentary work.

Behavioral health and rehabilitation counselor Dr. Cates testified at trial about his vocational evaluation on Mr. Borne. After reviewing Mr. Borne's medical records, psychological assessments, and functional assessments, Dr. Cates observed Mr. Borne and interviewed him at length about his age, education, and work history. Crediting Dr. Dietze's initial assessment that Mr. Borne is not capable of performing sedentary work, Dr. Cates said, then he is unemployable and his work loss would be 100%. In the alternative, even crediting the assessments indicating that Mr. Borne can perform sedentary or light work, Dr. Cates felt that employers were not likely to respond well to the length of time Mr. Borne had been off work. Consequently, if it is assumed that Mr. Borne can perform sedentary work, Dr. Cates felt that his loss of vocational opportunity would be 95-98% of jobs with directly transferrable skills. Assuming Mr. Borne could perform light-duty work, Dr. Cates calculated his loss of vocational opportunity at approximately 93% for jobs with directly transferrable skills, 58% loss for jobs with generally transferrable skills, and 45% loss for unskilled jobs. Put differently, Dr. Cates opined that, if Mr. Borne were deemed capable of performing sedentary or light-duty work, he would be available for 55% of unskilled jobs.

Vocational analyst Anthony Gamboa testified at trial about his economic assessment of how Mr. Borne's physical limitations had affected his capacity to work and earn money. Dr. Gamboa's vocational economic assessment was based on Dr. Dietze's medical records, Mr. Borne's work history, earning records and vocational evaluation, and Dr. Roberts' June 2011 functional capacity evaluation. Based on this information, Dr. Gamboa concluded that Mr. Borne could neither sit nor stand for extended periods of time, so he could only do the type of sedentary work that would allow him to alternate sitting and standing. Given these restrictions and Mr. Borne's low level of reading comprehension, Dr. Gamboa opined that he would be able to perform only about 2% of the jobs in the labor market. He felt that employers would be reluctant to hire someone like Mr. Borne who had

been out of work for several years. Given these parameters, Dr. Gamboa described Mr. Borne as essentially "unemployable." Based on the average Louisiana heavy truck driver's earnings in 2011 dollars, and projecting Mr. Borne continuing to work until age sixty, Dr. Gamboa calculated Mr. Borne's lost earning capacity at $1,334,647.

Dr. Gamboa acknowledged that his calculation of Mr. Borne's lost earning capacity was done without knowledge of the improvement in his functionality after completing several months of physical therapy with Dr. Roberts. If it is assumed that Mr. Borne can perform light-duty or sedentary work, Dr. Gamboa said, then the vocational economic assessment "would be done in a very, very different way," and his loss of earning capacity would be less. However, Dr. Gamboa pointed out that Mr. Borne had only performed physical jobs in the past, such as working as a welder or a truck driver, so his lack of experience in light-to-sedentary jobs would put him at a competitive disadvantage in applying for those jobs. This testimony concluded Mr. Borne's case-in-chief.

Celadon then presented evidence in response. . . .

…

Celadon also presented the opinion testimony of Dr. Thomas, the neurosurgeon who examined Mr. Borne at the request of his workers' compensation carrier. Dr. Thomas reviewed an MRI performed in February 2010 and concluded that Mr. Borne had low back strain. Dr. Thomas examined Mr. Borne again in 2012, after Mr. Borne had completed the physical therapy with Dr. Roberts. Dr. Thomas determined that Mr. Borne's condition had improved significantly since his first visit and that he had reached maximum functional improvement. He felt that Mr. Borne's condition was lumbar strain or that it could be arthritic in nature. Dr. Thomas was of the opinion that, while Mr. Borne could not do heavy-duty work, he could do light-duty work or perhaps even work that was light-to-medium-duty.

Celadon also offered the testimony of neurosurgeon Robert Applebaum. Dr. Applebaum examined Mr. Borne after his physical therapy with Dr. Roberts, and he reviewed his

- 13 -

medical records, including the MRI films read by Dr. Glorioso and relied upon by Dr. Dietze. Dr. Applebaum concluded that Mr. Borne likely had no disease or damage involving his spinal cord or nerve roots and that there were no significant neck or back mechanical or neurological findings. He found degenerative changes in the lumbar spine that would have predated an accident in July 2009. Dr. Applebaum noted a moderate disc bulge at the L4-5 level but felt that it was not clinically significant. Dr. Applebaum found no evidence of impairment and concluded to a reasonable degree of medical certainty that Mr. Borne could return to work in any occupation for which he was otherwise qualified.

Rehabilitation counsel Carla Seyler also testified on behalf of Celadon. Ms. Seyler performed her vocational rehabilitation examination on Mr. Borne after he had completed physical therapy with Dr. Roberts. She interviewed Mr. Borne, reviewed his work and educational history, and did vocational testing. She reviewed Mr. Borne's medical records, including those of Dr. Dietze and Dr. Applebaum, as well as the records of physical therapist Dr. Roberts. She interpreted the records of Dr. Dietze and Dr. Roberts as indicating that Mr. Borne would be able to perform sedentary to light-duty work, and she interpreted Dr. Applebaum's records as indicating that Mr. Borne could return to his regular work with no restrictions. Under either physical evaluation, Ms. Seyler opined, Mr. Borne would be able to secure a job compatible with his education, work history, and physical restrictions, and he would be able to replace his income prior to the July 2009 accident. To overcome the three-year gap in his work history, Ms. Seyler suggested that Mr. Borne spend a period of time working short-term jobs for a temporary service, to gradually get back into the workforce. After a period of transition, Ms. Seyler asserted, Mr. Borne would be able to secure a job making an amount of money that would equal or exceed what he was making at the time of the accident.

*Borne*, 532 S.W.3d at 287-91.

On remand, the trial court entered an amended order regarding Celadon's motion for a new trial or remittitur, explaining as follows:

- 14 -

## FINDINGS OF FACT AS TO REMITTITUR
## LOSS OF EARNING CAPACITY

9. The Plaintiff called Dr. Anthony Gamboa, Jr. as a vocational economic analyst who testified that he conducted a vocational economic assessment on Mr. Borne, looking at his education, medical records, earning history, his deposition and average earnings for a person doing the type of work he was doing, heavy truck driver.

10. In doing his evaluation, [Dr. Gamboa] determined that Mr. Borne had an occupational disability, in that because of his injuries, he would have limitations in the terms of the amount or kind of work he would be able to perform.

11. Dr. Gamboa found that [Mr. Borne's] lifetime loss of earning capacity was $1,334,647 based upon his work history, which included fringe benefits but did not consider any reduction for business expenses which Mr. Borne was taking as a truck driver.

12. Dr. Gamboa in his analysis of Mr. Borne's health status did not review the report prepared by Dr. Roberts which found that Mr. Borne had improved after completing 5 to 6 month[s] of physical therapy.

13. The Plaintiff called Dr. C. Greg Cates who has a practice in rehabilitation counseling and vocational rehabilitation.

14. In his analysis [Dr. Cates] considers a person[']s[] age, education, work history and then physical or mental limitations.

15. On July 23, 2012[,] he conducted a vocational exam of Mr. Borne, wherein he considered the medical records of testified [sic] as Plaintiff[']s to the effect a disability has [on] a person's capacity to work and earn.

16. Dr. Cates found that Mr. Borne was significantly impaired and will have a difficult time reentering the workplace. Although as a rehabilitation professional, you hope everybody at some point in time returns to the workplace.

- 15 -

17. Tamara Williams, Mr. Borne's Wife, testified that he was a "very hard worker" and was always working. He wanted to work and wanted to be a provider.

18. She indicated that he was always active and was handy around the house, caring for her and his mother.

19. After the accident [Mr. Borne] saw Dr. Waguespack who put him on light duty, which did not make Mr. Borne happy, because he still wanted to try and go to work.

20. Mr. Borne detailed a long history of working in a variety of fields and continued to better himself, finding better employment and opportunity through the years.

21. When he was further restricted by Dr. Deitz and took him off of work entirely [sic] which also frustrated him because he was worried about how he was going to survive.

22. He indicated that while he was drawing workers' compensation, he was not happy because it was not giving him the life that he wanted. "I would do what it takes to make a living for my family; not sit around and look at people."

23. The Plaintiff called Dr. Courtney Roberts, a doctorate [sic] in physical therapy, who operates a Physical Therapy practice in New Orleans where she deals with chronic pain patients.

24. Typically the goal of treatment is to improve the patient's quality of life, increasing their activity level while maintaining their pain on a lower level.

25. On May 24th, 2011[,] she performed a functional capacity evaluation on Mr. Borne testing his physical capacity doing a variety of activities testing his tolerance for his ability to do them and to see if he can return to work.

26. Dr. Roberts conducted forty-five (45) sessions of physical therapy, looking to increase [Mr. Borne's] range of motion, decreasing his pain, decreasing the muscle tightness,

increasing his strength and increasing muscular stability.

27.   That at the conclusion of the physical therapy [Mr. Borne] had improved in his ability to lift and repetitive activities however a subsequent functional capacity evaluation was not done so it was difficult for Dr. Roberts to quantify [Mr. Borne's] new functional capacity.

28.  Taking all of the proof in regarding [Mr. Borne's] strong work ethic, effort and success at rehabilitation, and desire to support his family, the Court believes that he will persevere and will have some future income over the next 38 years which is the basis for reducing the loss of earning capacity from $1,455,000.00 to $1,100,000.00.

(Citations to the record omitted.).  Mr. Borne timely appealed.

## II.     ISSUE

The issue before this court on appeal is the following:

Whether the trial court erred in suggesting remittitur of the jury award for loss of earning capacity.

## III.     STANDARD OF REVIEW

The remittitur statute, Tennessee Code Annotated section 20-10-102, provides in full as follows:

(a) In all jury trials had in civil actions, after the verdict has been rendered and on motion for a new trial, when the trial judge is of the opinion that the verdict in favor of a party should be reduced and a remittitur is suggested by the trial judge on that account, with the proviso that in case the party in whose favor the verdict has been rendered refuses to make the remittitur, a new trial will be awarded, the party in whose favor such verdict has been rendered may make such remittitur under protest, and appeal from the action of the trial judge to the court of appeals.

(b) The court of appeals shall review the action of the trial

court suggesting a remittitur using the standard of review provided for in T.R.A.P. 13(d) applicable to decisions of the trial court sitting without a jury. If, in the opinion of the court of appeals, the verdict of the jury should not have been reduced, but the judgment of the trial court is correct in other respects, the case shall be reversed to that extent, and judgment shall be rendered in the court of appeals for the full amount originally awarded by the jury in the trial court."

The statute directs that we use the standard of review set forth in Rule 13(d) of the Tennessee Rules of Appellate Procedure: "[R]eview of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of correctness of the finding, unless the preponderance of the evidence is otherwise. . . ." Tenn. R. App. P. 13(d).

We are mindful that under the Tennessee constitution, the invocation of the right to a jury trial requires that the jury be permitted to determine all disputed factual issues. *Borne*, 532 S.W.3d at 308 (citations omitted). As noted in *Walton ex rel. Walton v. Tullahoma HMA, LLC*, 572 S.W.3d 180, 184 (Tenn. Ct. App. 2018),

> "The questions of disputed fact to be resolved by the jury include the type and amount of any damages awarded to the plaintiff." *Id.* [(citing *Borne*, 532 S.W.3d at 308)]. This does not mean, however, that a jury's verdict is not subject to judicial supervision in the trial court. "The power of a trial judge to disturb a verdict because of his [or her] dissatisfaction with the amount of damages rests in this state on more than a century of precedent and practice." *Foster v. Amcon Int'l, Inc.,* 621 S.W.2d 142, 144 (Tenn. 1981). Indeed, "[w]hile the amount of the verdict is primarily for the jury to determine, the trial judge who presided at the trial and heard the evidence is the next most competent person to pass upon the matter." *Burlison v. Rose*, 701 S.W.2d 609, 611 (Tenn. 1985) (citation omitted).

*Walton*, 572 S.W.3d at 184.

## IV.    DISCUSSION

Borne argues that the trial court's remittitur of the jury's verdict regarding loss of earning capacity is inconsistent with a preponderance of the evidence. According to Borne, Dr. Gamboa opined that $1,334,467 represented the earning capacity of an

- 18 -

average truck driver of the same age as Borne and also considered factors unique to Borne, including his significant reading deficiency. Borne notes that he previously compensated for his functional limitations, namely a reading deficiency, with jobs that depended on his physical capabilities. He observes that Dr. Gamboa testified that even assuming Borne qualified to perform sedentary work, he was unemployable, given his functional limitations, history, education, and training. Borne further stresses that Dr. Cates's analysis showed Borne's injury resulted in a 95% to 99% loss of vocational opportunities if Borne's physical capabilities limited him to sedentary employment, and a 93.2% reduction in such opportunities if Borne was physically capable of light work. Borne contends that the trial court's findings as to loss of earning capacity discount the testimony that Borne's functional challenges and employment history render him unemployable in spite of his physical capacity for sedentary or light work.

According to Borne, the jury's award (including the excess amount of $120,353 above Dr. Gamboa's calculations) is consistent with "Tennessee's liberal admission of evidence pertaining to loss of earning capacity" and the recognition that earning capacity is "to some extent, speculative and imprecise." *See Overstreet v. Shoney's, Inc.,* 4 S.W.3d 694, 704 (Tenn. Ct. App. 1999)). The jury was instructed to "consider any evidence of plaintiff's earning capacity including, among other things, plaintiff's health, age, character, occupation, past earnings, intelligence, skill, talents, experience and record of employment." *Id.* Borne argues, therefore, that under the law and the trial court's explicit instructions, the jury was permitted to determine that Borne's physical injuries had a devastating impact on his earning capacity that would not have been similarly compromised for an individual with a "white collar" employment history. He claims that his testimony as to the product-delivery and mileage incentives available under the Trimac pay scale in conjunction with testimony that he was a "very hard worker" who wanted to better himself financially, established and proved his pre-injury potential to earn more than the average heavy truck driver. Borne therefore requests that we reverse the trial court's remittitur and reinstate the jury verdict for loss of earning capacity, arguing that the amended order of the trial court does not recite any proof to justify a $355,000 remittitur of a $1,455,000 jury award.

Celadon contends that a preponderance of the evidence supports the trial court's remittitur of the jury award regarding loss of earning capacity. According to Celadon, the jury made the "unfounded assumption" that Borne would never "earn another dollar in his life" and awarded Borne 100% of his lost wages as if he would never again be able to return to work rather than the difference between the wage he earned before the accident and what he is capable of earning after the accident. Celadon asserts that the testimony of Dr. Gamboa is discredited by: (1) his failure to review and consider key evidence in this case; (2) testimony concerning Borne's work history, work ethic, skills, and ability to learn; and (3) errors in the method of Dr. Gamboa's calculation of Borne's alleged lost earning capacity. Celadon argues that had Dr. Gamboa considered the relevant evidence, his opinion would have reflected the fact that Borne was capable of working in the future,

which would have significantly diminished the $1,334,647 calculation for his alleged loss of earning capacity. Celadon notes that the trial court's findings specifically indicated: "Dr. Gamboa in his analysis of Mr. Borne's health status did not review the report prepared by Dr. Roberts which found that Mr. Borne had improved after completing 5 to 6 months of physical therapy." According to Celadon, this credibility determination by the trial court should be given due deference by this court. *Foster*, 621 S.W.2d at 145. Celadon claims that Borne is capable of obtaining gainful employment and can reenter the workforce at a host of positions.

Celadon, while pointing out that the majority opinion of the Tennessee Supreme Court in *Borne* questioned "[w]hether there is even *material* evidence in the record to support [the jury] award [for lost earning capacity]" and observed that "the evidence Celadon used to undermine the basis for Dr. Gamboa's testimony was substantial," notes that the jury award is higher than the $1,334,647 figure that Borne's expert calculated. *Borne*, 532 S.W.3d at 317 n. 26, 318 n. 27 (emphasis in original). According to Celadon, a review of the record and of the trial court's amended order providing reasons for its remittitur reflects that no evidence was introduced in support of a loss of earning capacity award in excess of $1,334,647, and that figure included no reduction whatsoever for future earnings should Borne return to work. Celadon further notes that the method of Dr. Gamboa's calculation of the total for lost earning capacity was flawed because he did not consider any reduction for business expenses that Borne was taking as a truck driver, as he based his calculation on the average income of an over-the-road truck driver in Louisiana of $38,021 per year rather than Borne's actual earnings of $36,000 per year, and because he failed to calculate a net discount to present value as required by Tennessee law. All of these flaws, Celadon posits, led to a significantly inflated lost earning capacity figure.

Celadon contends that if the court finds that the trial court's remittitur of the jury award for loss of earning capacity to $1,100,000 is not supported by a preponderance of the evidence, the award for loss of earning capacity should be capped at $1,334,647, as there is no proof in the record to support an award for loss of earning capacity higher than that amount.

Earning capacity refers not to actual earnings, but rather to the earnings that a person is capable of making. *See Southern Coach Lines v. Wilson*, 214 S.W.2d 55, 56 (Tenn. Ct. App. 1948) (explaining that earning capacity refers to the loss of the power to earn). The extent of an injured person's loss of earning capacity is determined by comparing what the person would have been capable of earning but for the injury with the income which the person is capable of earning after the injury. *See Overstreet*, 4 S.W.3d at 703. If the injury is permanent, this amount should be multiplied by the injured person's work life expectancy, and the result should be discounted to its present value. *Id.* In order to recover these damages, the injured person must first prove with reasonable certainty that the injury has or will impair his earning capacity. *Id.* Then, the

injured party must introduce evidence concerning the extent of the impairment of his earning capacity. *Id.*

In 29 Am. Jur. 3d Proof of Lost Earning Capacity § 5 (1995), fact finders are instructed to distinguish between impaired physical capacity and impaired earning capacity. They are not necessarily the same: "Proof of impaired physical ability is not always equivalent and therefore not always sufficient to prove impaired capacity to earn. Depending upon an individual's skill, education, training or experience, a severe physical disability may make no difference at all to one individual's capacity to earn while an otherwise trivial injury may make a significant difference to another . . . ." *See Overstreet*, 4 S.W.3d at 703-704.

The trial court seemed to base its suggested remittitur determination on the failure of Dr. Gamboa to not include a review of Dr. Roberts's findings of improvement and for not considering any reduction for business expenses. The trial court acknowledged, however, that "Dr. Cates found that Mr. Borne was significantly impaired and will have a difficult time reentering the workplace."

In our role in evaluating the preponderance of the evidence, giving proper deference to both the jury and to the trial judge in his capacity as the thirteenth juror, we find, as acknowledged by the Supreme Court, that the jury's awards "indicate that the jury credited the testimony of Mr. Borne's witnesses and did not credit the testimony of the witnesses presented by Celadon." *Borne*, 532 S.W.3d at 316. That testimony, as noted by the Court, provided that despite Dr. Roberts not being asked to update her June 2011 functional capacity evaluation after Borne completed the recommended round of physical therapy, "at the time of trial, based on her observations of Mr. Borne during physical therapy, it was Dr. Roberts' opinion that Mr. Borne had improved to the point that he could probably perform sedentary work." *Borne*, 532 S.W.3d at 289. Dr. Cates related, however, that "even crediting the assessments indicating that Mr. Borne can perform sedentary or light work, . . . employers were not likely to respond well to the length of time Mr. Borne had been off work," and observed that "if it is assumed that Mr. Borne can perform sedentary work, . . . his loss of vocational opportunity would be 95-98% of jobs with directly transferrable skills." *Id.* Dr. Gamboa, in view of Borne's "low level of reading comprehension" . . . opined that [Borne] would be able to perform only about 2% of the jobs in the labor market. He felt that employers would be reluctant to hire someone like Mr. Borne who had been out of work for several years" and "described Mr. Borne as essentially " 'unemployable.'" *Id.* Dr. Gamboa commented that "there are very, very, very few" occupations open to Borne, and that "he's just going to have extreme difficulty getting a job." *Borne*, 2014 WL 3778743, at *23. Dr. Cates and Dr. Gamboa testified that, based on Borne's physical limitations and prolonged work absence since the accident, Mr. Borne would likely never work again. The fact that Borne desires to work and has a strong work ethic does not overcome this testimony. Celadon presented no evidence suggesting an alternative, lower dollar figure than that calculated

- 21 -

by Dr. Gamboa.

As we determined in our prior opinion, "Dr. Gamboa clearly did not base his assessment upon any medical determination that Plaintiff is physically unable to return to *any* job. Instead, he opined that Plaintiff's limited credentials essentially leave him unable to compete for the jobs which he can physically perform." *Borne*, 2014 WL 3778743, at *24 (emphasis in original). We find that the evidence preponderates against the trial court's remittitur to $1,100,000, as nothing in the record supports a reduction below Dr. Gamboa's calculation of $1,334,647. The evidence also preponderates against the jury's award of $1,455,000 because there is no evidence in the record to support any loss of earning capacity $120,353 greater than the amount calculated by Dr. Gamboa. Accordingly, the jury's award for loss of earning capacity is remitted to $1,334,647.

## V.   CONCLUSION

For the aforementioned reasons, we reverse the judgment of the trial court and remit the jury's verdict for loss earning capacity damages to $1,334,647. The case is remanded to the trial court for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Celadon Trucking Services, Inc.

_____
JOHN W. MCCLARTY, JUDGE