IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 27, 2018 Session

## SUSAN WALTON EX REL. JAMES WALTON v. TULLAHOMA HMA, LLC

**Appeal from the Circuit Court for Coffee County**
**No. 40937    Vanessa Jackson, Judge**

_____

### No. M2017-01366-COA-R3-CV

_____

This is a case of healthcare liability and wrongful death. After the decedent's death at a Tullahoma hospital, his surviving spouse filed suit seeking damages for his injuries and death. The case was eventually tried before a jury, and a verdict was returned in favor of the Plaintiff. Although the jury determined that the total damages were $300,000, the trial court suggested an additur of over $1,000,000. An amended final judgment was subsequently entered after the trial court determined that the Defendant had accepted the additur under protest. Because we are of the opinion that the trial court's additur destroyed the jury's verdict, we reverse the trial court's judgment and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY ARMSTRONG, J., joined.

Mark T. Smith, Amy R. Mohan, and Andrea J. Sinclair, Nashville, Tennessee, and William C. Rieder, Tullahoma, Tennessee, for the appellant, Tullahoma HMA, LLC d/b/a Harton Regional Medical Center.

William D. Leader and Paul J. Krog, Nashville, Tennessee, and Andy Peters Davis, Winchester, Tennessee, for the appellee, Susan Walton.

**OPINION**

**BACKGROUND AND PROCEDURAL HISTORY**

On November 27, 2012, James Walton was admitted to Harton Regional Medical Center in Tullahoma, Tennessee for treatment of kidney stones. Following his admission to the hospital, Mr. Walton was placed on a patient controlled analgesia pain pump ("PCA pump"), which was programmed to deliver set amounts of morphine to him at certain intervals when a button on the pump was pressed. This allowed Mr. Walton to administer morphine to himself, and it is undisputed that he used the PCA pump in this manner following its provision to him by the hospital. Moreover, according to Mr. Walton's wife, Susan Walton, she was instructed by a nurse to press her husband's PCA pump button while he was sleeping in order to "keep ahead of the pain." Mrs. Walton complied with this alleged instruction and pressed the PCA pump button regularly throughout the night following her husband's admittance.

Unfortunately, Mr. Walton's life was in peril by the following morning. Shortly after 7:30 a.m., Mrs. Walton noticed that her husband was not breathing. Mrs. Walton subsequently contacted the nursing staff, a code was called, and Mr. Walton was resuscitated. It was later determined that Mr. Walton had suffered a brain injury, and he was taken off life support a few days later on December 2, 2012.

Following her husband's death, in January 2014, Mrs. Walton commenced the present action in Circuit Court against Tullahoma HMA, LLC ("the Defendant"), the entity that operates the hospital where Mr. Walton was treated. Her complaint sought to "recover damages for James Walton's injuries and wrongful death" and averred that the Defendant was vicariously responsible for the negligent actions and omissions committed by the hospital staff. In outlining the specific wrongs allegedly giving rise to liability, the complaint asserted as follows:

> Tullahoma HMA, LLC d/b/a Harton Regional Medical Center, acting through its employees, agents and representatives was negligent in its care and treatment of James Walton in that such care and treatment fell below the recognized standard of acceptable professional practice for nursing staff and hospitals in this or similar communities in the following respects:
>
> a. Failed to appropriately treat, manage, care for and monitor James Walton;
> b. Failed to adequately train, supervise and monitor the nurses, hospital staff, employees and agents providing care to James Walton;

c. Failed to establish, promulgate, enforce and follow appropriate rules, regulations, policies, guidelines and procedures for the management and operation of a PCA pump;

d. Failed to educate nurses, hospital staff, employees and agents on the safe use of a PCA pump and the potential effect of opioid therapy on sedation and respiratory depression; and

e. Failed to act with ordinary and reasonable care and in accordance with the recognized standard of acceptable professional practice and care for hospitals, nursing staff and hospital personnel in Tullahoma, Tennessee and similar communities.

The complaint asserted that Mrs. Walton was entitled to recover for Mr. Walton's medical expenses as well as the pecuniary value of his life. In addition, the complaint specifically claimed that a loss of consortium had been sustained with regard to the relationships that had existed between Mr. and Mrs. Walton and between Mr. Walton and his son.

On March 5, 2014, the Defendant filed an answer to the complaint, and a few months later, on August 8, 2014, it filed an amended answer. In its amended answer, the Defendant asserted a comparative fault defense and placed Mrs. Walton's actions directly at issue. In relevant part, the amended answer stated as follows: "To the extent that the evidence shows that Plaintiff Susan Walton was or may have been at fault with respect to her use of the PCA pump and her administration of the narcotic medication to her husband, Defendant requests that the conduct of Mrs. Walton be considered by the trier of fact for purposes of determining the comparative fault of the parties, and that Defendant's liability, if any, not exceed the percentage of fault assigned to it."

A multi-day jury trial was conducted in December 2016, and following the conclusion of the proof, a verdict was returned in favor of Mrs. Walton. The jury determined that the Defendant was 51% at fault for Mr. Walton's death, while 49% of the fault was assigned to Mrs. Walton. Irrespective of its assignment of fault, the jury determined that the total damages proven at trial were $300,000. This amount included $300,000 for loss of earning capacity and $0 for loss of consortium.

On December 29, 2016, the trial court entered an order of judgment consistent with the jury's verdict. Shortly thereafter, on January 20, 2017, Mrs. Walton moved the trial court to grant a new trial, or in the alternative, for an additur. The Defendant opposed Mrs. Walton's request for relief and filed a response asserting that there was nothing about the jury's decision that mandated a modification of the damages award. As noted below, the trial court did not ultimately find favor in the merits of the Defendant's position on this issue.

By order entered on March 7, 2017, the trial court determined that the jury's damages award was "inadequate to compensate the Plaintiff." It accordingly suggested an additur adjustment in the amount of $1,061,042.71, including $300,000 in damages for loss of consortium. The Defendant was given thirty days to file a written acceptance of the suggested additur, and on April 6, 2017, it submitted a filing which the trial court deemed was a "timely written acceptance [of the additur] under protest." An amended final judgment incorporating the additur was subsequently entered by the trial court on June 19, 2017. Although the Defendant then attempted to raise a number of issues concerning the trial court's pre-trial and trial rulings by filing a "Motion for New Trial Or, In the Alternative, for Judgment Notwithstanding the Verdict," that motion was denied. The present appeal soon followed.

## ISSUES PRESENTED

In addition to appealing the trial court's additur ruling, the Defendant has alternatively attempted to appeal a number of other issues, most of which are related to the conduct of the December 2016 trial.[1]

## DISCUSSION

In Tennessee, the constitutional right to a jury trial is found in Article 1, § 6 of the Tennessee Constitution. *See* Tenn. Const. art. 1, § 6 ("That the right of trial by jury shall remain inviolate, and no religious or political test shall ever be required as a qualification for jurors."). Where a party invokes the right to a jury trial, our constitution requires that the jury be permitted to determine all disputed factual issues. *Borne v. Celadon Trucking Servs., Inc.*, 532 S.W.3d 274, 308 (Tenn. 2017) (citations omitted). "The questions of disputed fact to be resolved by the jury include the type and amount of any damages awarded to the plaintiff." *Id.* (citation omitted). This does not mean, however, that a jury's verdict is not subject to judicial supervision in the trial court. "The power of a trial judge to disturb a verdict because of his [or her] dissatisfaction with the amount of damages rests in this state on more than a century of precedent and practice." *Foster v. Amcon Int'l, Inc.*, 621 S.W.2d 142, 144 (Tenn. 1981). Indeed, "[w]hile the amount of the verdict is primarily for the jury to determine, the trial judge who presided at the trial and heard the evidence is the next most competent person to pass upon the matter." *Burlison v. Rose*, 701 S.W.2d 609, 611 (Tenn. 1985) (citation omitted).

The trial judge serves as a check on the jury's function through his or her role as the "thirteenth juror." *Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 420 (Tenn. 2013). In acting as the thirteenth juror, "the trial judge must independently weigh and review the evidence presented at trial to determine whether it preponderates in favor

---

[1] As noted later in this Opinion, the issues alternatively raised outside of additur review are pretermitted in light of our conclusion with respect to the propriety of the suggested additur.

- 4 -

of the verdict and decide whether he or she agrees with and is satisfied with the jury's verdict." *Id.* (citation omitted). A verdict is not valid if it is not approved by the trial judge acting as the thirteenth juror. *Id.* (citations omitted).

There are a number of ways in which the trial judge can express disapproval when acting as the thirteenth juror. If the judge determines that the verdict is contrary to the weight of the evidence, he or she must grant a new trial. *Turner v. Jordan*, 957 S.W.2d 815, 823 (Tenn. 1997) (citation omitted). However, if the trial judge is solely dissatisfied with the amount of damages awarded by the jury, he or she may suggest an adjustment to the verdict by way of an additur or remittitur. *Id.*

In this case, we are concerned with the trial judge's suggestion of an additur. The procedure for an additur, which involves an increase to the jury's damages award, is authorized by Tennessee Code Annotated section 20-10-101. That statute, which helps "'to avoid repeated trials of factual issues and . . . to do equal justice to the parties,'" *Burlison*, 701 S.W.2d at 611 (quoting *Murphy Truck Lines v. Brown*, 313 S.W.2d 440, 443 (Tenn. 1958)), provides in relevant part as follows:

> (a)(1) In cases where, in the opinion of the trial judge, a jury verdict is not adequate to compensate the plaintiff or plaintiffs in compensatory damages or punitive damages, the trial judge may suggest an additur in such amount or amounts as the trial judge deems proper to the compensatory or punitive damages awarded by the jury, or both such classes of damages.

> (2) If the additur is accepted by the defense, it shall then be ordered by the trial judge and become the verdict, and if not accepted, the trial judge shall grant the plaintiff's motion for a new trial because of the inadequacy of the verdict upon proper motion being made by the plaintiff.

Tenn. Code Ann. § 20-10-101(a). The statute also permits, as was done here, a defendant to accept a suggested additur under protest and appeal to this Court. *See* Tenn. Code Ann. § 20-10-101(b).[2]

---

[2] There is constitutional significance to requiring a new trial in the absence of consent to the proposed additur. As explained by the Tennessee Supreme Court:

> The rationale for requiring such consent is that when the trial court grants a motion for an additur, it is essentially disagreeing with the jury's determination of damages—which is a question of fact. Because the trial court is acting in its capacity as "thirteenth juror," the right to jury trial clauses of the federal and state constitutions—which require that the jury be allowed to determine all disputed issues of fact, *Finks v. Gillum,* 38 Tenn.App. 304, 273 S.W.2d 722 (1954); *Morgan v. Tennessee Central Ry.,* 31 Tenn.App. 409, 216 S.W.2d 32 (1948)—mandate that the trial court obtain the consent of the party against whom the additur is to be entered. And if that party does not accept the additur, the trial court must order a new trial. Tenn. Code Ann. § 20–10–101(a)(2).

- 5 -

The question currently before us is whether the trial court's additur ruling was in error. In answering this question, the statute directs that we use the standard of review "provided for in T.R.A.P. 13(d) applicable to decisions of the trial court sitting without a jury." Tenn. Code Ann. § 20-10-101(b)(2). The statute provides that if we are of the opinion that the jury's verdict should not have been increased or that the amount of additur was improper, but that the judgment was correct in all other respects, "the case shall be reversed to that extent, and [we] may order remitted all or any part of the additur." *Id.* As we have previously noted, our duty is "to determine whether the trial court's adjustments were justified, giving due credit to the jury's decision regarding the credibility of the witnesses and due deference to the trial court's prerogatives as thirteenth juror." *Long v. Mattingly*, 797 S.W.2d 889, 896 (Tenn. Ct. App. 1990) (citations omitted).

In specifically carrying out the scope of our appellate review, we are guided by a three-step process:

> First, we examine the reasons for the trial court's action since adjustments are proper only when the court disagrees with the amount of the verdict. Second, we examine the amount of the suggested adjustment since adjustments that "totally destroy" the jury's verdict are impermissible. Third, we review the proof of damages to determine whether the evidence preponderates against the trial court's adjustment.

*Id.* (internal citations omitted).[3]

*Examination of the Reasons for the Trial Court's Adjustments*

As alluded to above, "[t]he primary purpose of the first *Long v. Mattingly* prong, looking at the trial court's stated reasons for the adjustment, is to determine whether the trial court 'disagreed with other than the amount of the verdict.'" *Borne*, 532 S.W.3d at 311 (quoting *Burlison*, 701 S.W.2d at 611). Although that task is no doubt frustrated when an actual explanation for an adjustment is absent, a trial judge's failure to provide reasons for an adjustment can also impact an appellate court's ability to assess the third prong of the *Long v. Mattingly* process, which reviews whether the evidence preponderates against the adjustment. The Tennessee Supreme Court has recently explained this in a case dealing with remittitur:

---

*Spence v. Allstate Ins. Co.*, 883 S.W.2d 586, 594 (Tenn. 1994).

[3] Although *Long v. Mattingly* was a remittitur case, its three-step process for reviewing adjustments to the jury's verdict also applies in cases involving an additur. *See, e.g.*, *Ledford v. French*, No. 02A01-9106-CH-00102, 1992 WL 1144, at *2 (Tenn. Ct. App. Jan. 7, 1992) (stating, in an additur case, that the scope of appellate review is set forth by the opinion in *Long v. Mattingly*).

[The third] prong requires the appellate court to evaluate the preponderance of the evidence, giving proper deference to both the jury and to the trial judge in his capacity as thirteenth juror. As this Court has noted, when the trial court weighs the evidence in his capacity as thirteenth juror, this can include an independent evaluation of the credibility of the witnesses[.]

. . . .

Therefore, if the evidence regarding damages was conflicting and required both the jury and the trial court sitting as thirteenth juror to assess the credibility of the witnesses, a trial court's failure to explain the basis for its suggestion of remittitur may leave the appellate court in the dark as to whether, or how, the trial court's view of the credibility of the witnesses may have differed from that of the jury.

*Id.* at 312-13.

Although the Defendant argues that the trial court did not provide an adequate explanation for its adjustments, we are satisfied that an adequate explanation for the reasons behind the suggested additur was offered. The trial court's order on additur clearly evidenced dissatisfaction with the amount of the jury's verdict, as it held that the damages awarded were "inadequate to compensate the Plaintiff." Beyond communicating mere dissatisfaction with the amount of the verdict, however, specific explanations were provided as to why the trial court suggested the adjustments that it did. Concerning damages for loss of earning capacity, the trial court noted that the testimony of Mrs. Walton's expert witness was "more credible and convincing." Moreover, concerning damages for loss of consortium, the trial court offered, among other things, its own assessment that the evidence had "overwhelmingly established that strong family bonds existed between James Walton, Susan Walton and Russ Walton." Although it is unclear to us that there is any reversible error with respect to this issue, we are nevertheless of the opinion that the suggested additur is not permissible under the second *Long v. Mattingly* prong. We accordingly shift our focus to that concern.

*Examination of the Suggested Adjustment*

Scrutiny is given to the amount of the suggested additur because adjustments that "totally destroy" the jury's verdict are impermissible. *Long*, 797 S.W.2d at 896 (citations omitted). In the past, the appellate courts have often resorted to discussing numerical figures to gauge the propriety of a suggested additur. For example, as we noted in our decision in *McKinney v. Smith County*, No. M1998-00074-COA-R3-CV, 1999 WL 1000887 (Tenn. Ct. App. Nov. 5, 1999), a number of different ratios connected to additurs have withstood appellate review:

[I]n examining the relation between the amount of the additur and the amount of the jury's verdict, courts invariably quantify the ratio that the resulting judgment bears to the original jury verdict. In *Lynch v. Turner,* No. 01A01-9109-CV-00325, 1992 WL 23122, at *2 (Tenn.App. Feb.12, 1992) (*no perm. app. filed*), for example, we noted that "most of the reported cases deal with additurs in the range of one to two times the jury verdict." There, we affirmed a suggested additur even though the resulting judgment was four times larger than the jury's verdict. Similarly, in *Ledford v. French,* No. 02A01-9106-CH-00102, 1992 WL 1144, at *2 (Tenn. App. Jan.7, 1992) (*no perm. app. filed*), we affirmed an additur even though the resulting judgment was approximately five times larger than the jury's verdict. And, in *Phillips v. Perot,* No. 02A01-9704-CV-00094, 1998 WL 117325, at *2 (Tenn.App. Mar.17, 1998) (*no perm. app. filed*), we affirmed all of the trial court's suggested additurs where the largest additur was roughly five-and-one-half times greater than its corresponding verdict. In each of these cases, we concluded that the amount of the suggested additur did not destroy the verdict's integrity. *Cf. Foster v. Amcon Int'l, Inc.,* 621 S.W.2d 142, 148 (Tenn.1981) (reversing additur that was thirty times jury's verdict); *Lebovitz v. Bearden,* No. 02A01-9211-CV-00308, 1993 WL 471479, at *4 (Tenn.App. Nov.16, 1993) (*no perm. app. filed*) (reversing additur that was more than twenty times jury's verdict).

*Id.* at *5 (internal footnote omitted).

Although these past results suggest that an additur of around two to four times the jury's verdict would perhaps be permissible and an additur increasing the verdict by a factor of twenty or more would clearly not be, case law cautions against such mechanical review. Mere ratios, considered singularly, should not necessarily serve as a proxy for measuring whether the integrity of the jury's verdict is destroyed. *See Foster*, 621 S.W.2d at 148 n.9 ("[W]e do not intend to establish a numerical standard for reviewing additurs and remittiturs."); *Myers v. Myers*, No. E2004-02135-COA-R3-CV, 2005 WL 1521952, at *4 (Tenn. Ct. App. June 27, 2005) ("[T]he Supreme Court has shied away from setting numerical standards for reviewing additurs and remittiturs."); *Lebovitz v. Bearden*, 1993 WL 471479, at *4 (Tenn. Ct. App. Nov. 16, 1993) (stating that the Court did not propose to establish a numerical standard for reviewing additur cases on appeal). One judge, in reflecting on the lack of certainty in cases discussing additur ratios, offered the following suggestion:

Perhaps the best way to reconcile this case with other similar cases is to place the emphasis on determining whether or not the additur or remittitur would result in an award not only proportionally different from the jury verdict but also substantially different in absolute terms. That is to say,

verdicts of relatively small amounts of money might be granted additurs or remittiturs of greater percentages than verdicts of relatively large amounts.

*Phillips v. Perot*, No. 02A01-9704-CV-00094, 1998 WL 117325, at *4 (Tenn. Ct. App. Mar. 17, 1998) (Lanier, Sp. J., concurring).

In this case, the suggested additur adjustment was over a million dollars, specifically, $1,061,042.71. This included adding over $300,000 in damages for loss of consortium, which had originally been determined to be $0 by the jury. Because the original jury verdict was a total of $300,000, the suggested adjustment brought the final amended judgment to $1,361,042.47 once the additur was accepted.[4]

In our opinion, the suggested additur in this case was so large that the resulting judgment bears no meaningful relationship to the original jury verdict. A judgment for $1,361,042.47 is a significant one, and in our view, it is one that is substantially and qualitatively different than a verdict for $300,000. It is simply of a different ilk, and as such, we are of the opinion that the suggested additur adjustment of over a million dollars totally destroyed the jury's verdict.

Although Mrs. Walton argues that the suggested additur falls within the range of additur ratios that have previously been approved by this Court, we again note that our courts have disclaimed setting a numerical standard for conducting appellate review. *See, e.g.*, *Foster*, 621 S.W.2d at 148 n.9 ("[W]e do not intend to establish a numerical standard for reviewing additurs and remittiturs."). Moreover, it should be noted that the cases relied upon by Mrs. Walton involved, what are in our assessment, a completely different realm of damages. For instance, although Mrs. Walton cites to the *Perot* decision to illustrate that this Court has previously approved additurs that increased a jury award over five-fold, the plaintiffs' respective judgments in that case were increased from $679.25 to $3,750.00, from $525.55 to $2,250.00, and from $2,500.00 to $4,000.00. *Perot*, 1998 WL 117325, at *2. Likewise, the other cases cited by Mrs. Walton involved suggested adjustments of other relatively "lower" absolute amounts. *See McKinney*, 1999 WL 1000887, at *5 (holding that a verdict was not destroyed where it was increased from $7,700.00 to $22,700.00); *Lynch v. Turner*, No. 01-A-019109-CV-00325, 1992 WL 23122, at *2 (Tenn. Ct. App. Feb.12, 1992) (additur of $15,000.00 did not destroy original verdict of $5,000.00); *Ledford*, 1992 WL 1144, at *1 (verdict of $1,240.00 increased by additur to a judgment of $6,240.00). While an adjustment by a factor of

---

[4] Of course, the damages ultimately awarded via the amended final judgment were then reduced after Mrs. Walton's comparative fault was applied to the total damages resulting from additur. It bears noting, although it is not of great mathematical difference, that there was a lack of precision with which some of the additur figures were discussed/computed in the order suggesting additur and in the order purporting to incorporate the suggested additur. We need not detail all of the apparent discrepancies for purposes of this appeal, but we would note that although the suggested additur was stated to be in the amount of $1,061,042.71, the amended final judgment lists the additional damages to be $1,061,042.47.

four or five might not be deemed to destroy a verdict when dealing with such amounts, we cannot reach the same conclusion in the case at bar. Again, the suggested additur at issue is over a million dollars, and in our opinion, it results in a judgment which totally destroys the integrity of the verdict returned by the jury. Because the additur destroys the jury's verdict, we reverse and vacate the judgment of the trial court and remand the case for a new trial. *See Foster*, 621 S.W.2d at 148 (remanding for a new trial after determining that the suggested additur "totally destroy[ed] the jury's verdict"); *Lebovitz*, 1993 WL 471479, at *4 (remanding for a new trial after determining that the suggested additur bore "no relation to the jury's award"). In light of this conclusion, it is not necessary to employ further review of the propriety of the suggested additur.[5]

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is reversed and the case is remanded for a new trial and for such further proceedings as may be necessary and consistent with this Opinion.

_____
ARNOLD B. GOLDIN, JUDGE

---

[5] Given our disposition herein, the alternative issues attempted to be raised outside of additur review are pretermitted. Our pretermitting of the remaining issues in this case should in no way be construed as this Court making a decision on the merits of these issues or in any way limiting the trial court from reconsidering its prior rulings on these issues on remand.