IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
August 19, 2021 Session

## JOHN LYNN v. PENSKE TRUCK LEASING CO., L.P.

**Appeal from the Circuit Court for Shelby County**
**No. CT-003081-17  Gina C. Higgins, Judge**

_____

### No. W2020-01202-COA-R3-CV
_____

This appeal involves review of a suggested additur which was accepted by the Defendant under protest. Because we conclude that the additur at issue satisfies the three-step review for adjustments made to a jury's verdict, we affirm the trial court's action.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which KENNY ARMSTRONG and CARMA DENNIS MCGEE, JJ., joined.

Harry W. Lebair, IV, Memphis, Tennessee, for the appellant, Penske Truck Leasing Co., L.P.

R. Sadler Bailey, Thomas R. Greer, and Noorhan Taube, Memphis, Tennessee, for the appellee, John Lynn.

## OPINION

## BACKGROUND AND PROCEDURAL HISTORY

This case arises from a May 2017 motor vehicle accident on Interstate 40 in Shelby County in which a vehicle owned by the Defendant/Appellant, Penske Truck Leasing Co., L.P., ("Penske"), struck the rear of another vehicle, causing it to run into the rear of a Shelby County Sherriff's Department cruiser operated by the Plaintiff/Appellee, Deputy John Lynn ("Mr. Lynn"). Mr. Lynn was injured as a result of the collision and thereafter filed the present lawsuit against Penske. Trial commenced in January 2020, and over the course of the proceedings, extensive proof was offered as to the injuries Mr. Lynn sustained as a result of the underlying accident and the medical treatment he received.

Immediately following the May 2017 collision, Mr. Lynn experienced pain in his lower back and in his neck. He testified that he went to the Baptist East hospital and that he was released after being given pain medication. Subsequently, he went to see Dr. Marvin Leventhal ("Dr. Leventhal"), an orthopedic surgeon. Mr. Lynn testified that he saw Dr. Leventhal a few times, that Dr. Leventhal ordered an MRI, and that he was referred by him to Dr. Matthew Kangas ("Dr. Kangas"), a pain specialist.

Dr. Leventhal, who testified by video deposition, stated that he saw Mr. Lynn for the first time on May 15, 2017. He testified that Mr. Lynn presented with pain in his neck, mid back, and lower back. Dr. Leventhal noted that Mr. Lynn had rated his pain at a 10 out of 10 and stated that he thought Mr. Lynn "present[ed] his complaints as he basically was experiencing them." Dr. Leventhal further stated that he "didn't think that [Mr. Lynn's] complaints were out of proportion to what happened to him." Indeed, Dr. Leventhal found Mr. Lynn to be a forthright and compliant patient.

Regarding the underlying accident at issue, Dr. Leventhal stated that "there's a lot of energy that's dissipated in that kind of thing when you don't know it's happening." His initial diagnosis was that Mr. Lynn "had a cervical thoracic and lumbar strain." Dr. Leventhal had the same diagnosis in a follow-up visit, but at that time, the lumbar problems were the most symptomatic. When Mr. Lynn came for a third visit with Dr. Leventhal, he continued to have central lower back pain. Dr. Leventhal stated that Mr. Lynn had looked better on that visit but noted that he still had complaints of significant pain. He stated that Mr. Lynn was still not capable of going back to work at that point, and he had felt that Mr. Lynn would benefit from having an epidural block.

Dr. Leventhal's testimony revealed that, in a June 2017 correspondence, a claims specialist managing Mr. Lynn's on-the-job injury claim for Shelby County had asked whether Mr. Lynn's diagnosis at the time was primarily related to the underlying incident.[1] Dr. Leventhal answered this question in the affirmative. In response to this same correspondence, Dr. Leventhal noted that he was referring Mr. Lynn to Dr. Kangas, for further evaluation regarding Mr. Lynn's pain issues. He also testified that, at that time, he had expressed his opinion that Mr. Lynn was not at maximum medical improvement. When asked if it would surprise him if Mr. Lynn had gone on to have significant problems for the very complaints for which he had seen him, Dr. Leventhal testified that it "would not surprise" him.

Dr. Kangas, who is a board-certified anesthesiologist with an interventional pain management fellowship, also provided testimony by video deposition. Dr. Kangas testified that he saw Mr. Lynn for the first time on July 20, 2017. He noted that Mr. Lynn had presented to him because he had continued low back pain and had failed conservative

---

[1] When discussing the correspondence sent, it was noted that the claims specialist had inadvertently typed the date in one place as "4-9-17" when "it should have been 5-9-17."

management up to that point. Dr. Kangas testified that the treatment he rendered to Mr. Lynn was all causally related to the May 2017 motor vehicle accident.

According to Dr. Kangas, Mr. Lynn was experiencing significant pain at the time he saw him, and per his assessment, Mr. Lynn had lumbar discitis, lumbar paraspinal muscle spasm, and lumbar facet pain. He prescribed a narcotic to treat Mr. Lynn's pain and thought Mr. Lynn should be off work. Moreover, he made a determination that Mr. Lynn should not lift greater than five pounds.

Dr. Kangas found Mr. Lynn to be a compliant and straightforward patient, and at an August 2017 visit, he found he was still having significant problems. Dr. Kangas recommended a right-sided medial branch block and "kept the same restriction of . . . less than five pounds." Dr. Kangas continued to give Mr. Lynn narcotic medication to treat his pain.

An interlaminar epidural procedure was performed in December 2017, and regarding a follow-up visit in January 2018, Dr. Kangas testified that Mr. Lynn still had significant pain at that time. Mr. Lynn's pain persisted in follow-ups to Dr. Kangas in February 2018. According to Dr. Kangas, Mr. Lynn's complaints were consistent with his physical examinations.

Dr. Kangas noted on a February 6, 2018 visit that Mr. Lynn could return to work on "2-7-18." Mr. Lynn had asked to go back to work, and Dr. Kangas stated that he would not have returned Mr. Lynn to work if he had not asked for it. Dr. Kangas stated, however, that Mr. Lynn's return to work had been subject to functional limitations, which he described as "[n]o stooping, bending, twisting, no squatting, climbing, crawling, no lifting or pushing over 10 pounds."

Although Dr. Kangas saw Mr. Lynn again on February 15, 2018, there was no noted improvement. Dr. Kangas testified that, at that time, he had continued narcotic medication and referred Mr. Lynn for a functional capacity evaluation. In the ensuing functional capacity evaluation performed by David Brick ("Mr. Brick"), Mr. Brick indicated that Mr. Lynn was giving submaximal effort. Dr. Kangas subsequently assigned maximum medical improvement with no restrictions in deference to Mr. Brick's evaluation, but Dr. Kangas also testified that his own examination at the time was consistent with his own previous examinations under which restrictions had been given to Mr. Lynn. Notably, both of the parties' appellate briefs emphasize that they neither adopted nor agreed with any portion of Mr. Brick's findings.

Dr. Kangas testified that he had seen Mr. Lynn the day before he gave his testimony and that "[h]is exam was the same," noting there was "bilateral low back pain, radiation into the buttocks, posterior thighs, with positive facet loading on exam." He further described that Mr. Lynn had an asymmetric gait, which he attributed to an attempt by him

"to guard a painful site on the body." Moreover, Dr. Kangas noted that Mr. Lynn had a limited range of motion and that his pain worsened when he tried to go past his limitations. According to Dr. Kangas, the problems he treated Mr. Lynn for are causally related to the motor vehicle accident of May 2017.

In June 2018, Mr. Lynn presented to Dr. Peter Lindy ("Dr. Lindy"), an orthopedic surgeon. Dr. Lindy testified at trial that Mr. Lynn was continuing to have pain when he saw him. Mr. Lynn had reported that his pain had persisted since his injury in May 2017, and Dr. Lindy noted that "[w]hen he presented . . . he was having pain[] at its worst nine out of ten." According to Dr. Lindy, "[Mr. Lynn] had indicated that he was currently working as a sheriff's deputy and had been, but he was having debilitating back pain interfering with his ability to perform his job." The main issue, Dr. Lindy pointed out, was with the gear belt Mr. Lynn was required to wear.

Dr. Lindy testified that he learned Mr. Lynn had not had any physical therapy prior to presenting to him.[2] Dr. Lindy, however, scheduled and arranged for it to occur. The therapy, he noted, "improve[d] [Mr. Lynn's] symptoms somewhat." He testified that Mr. Lynn would feel better at times with certain therapy regimens but that other times it "would not be as effective." Dr. Lindy testified that this was "[f]airly common, particularly when you're dealing with a back injury that is subacute."

As evidenced by Dr. Lindy's response to a December 2018 letter from Mr. Lynn's counsel, which was introduced as an exhibit at trial without objection, Dr. Lindy was of the opinion that Mr. Lynn's lower back pain was causally related to the May 2017 accident. He further opined that, in addition to a permanent restriction of not wearing a loaded full-duty gear belt, Mr. Lynn should not do heavy lifting or excessive bending. Dr. Lindy did not think Mr. Lynn could go back to his work and be physically capable of wearing his gear belt, stating, "That has been a consistent aggravating condition that I did not feel he could get beyond." He recommended Mr. Lynn for retirement if the Shelby County Sheriff's Department could not accommodate the restrictions.

Although Penske attempted to suggest through its questioning of witnesses that certain post-May 2017 events occurring at the high school where Mr. Lynn had worked as a resource officer were a cause of Mr. Lynn's injuries, Penske did not offer any expert witness that testified to such a conclusion. When Dr. Lindy was asked if he believed that Mr. Lynn's back would have collapsed on him during a December 2018 incident in the absence of the May 2017 event, he testified as follows: "I do not believe he would have had . . . that same episode." His testimony represented that the May 2017 accident "was a causative factor" of what happened in December. Dr. Lindy's testimony was clear that it was his contention that Mr. Lynn's problems were all causally related to the May 2017

---

[2] Dr. Lindy testified that it did not make any sense that no one had previously sent Mr. Lynn to physical therapy.

- 4 -

motor vehicle accident.

When asked about his experience with Mr. Lynn over the course of a year and a half, Dr. Lindy stated that he found Mr. Lynn's complaints to be consistent and truthful. Regarding the opinion of Dr. Daniel Hoit ("Dr. Hoit"), a neurological surgeon who recommended spinal stimulation as a treatment, Dr. Lindy stated that he would defer to the expertise of Dr. Hoit. Dr. Lindy further stated that there was a causal relationship between what Dr. Hoit saw Mr. Lynn for and the May 2017 motor vehicle accident.

Regarding Mr. Lynn's future prospects, Dr. Lindy testified that Mr. Lynn had a permanent injury, and he anticipated that he would have "some form of back pain for the rest of his life." When asked if Mr. Lynn could ever, with the best of medical care, be in a position where he could perform the full duties of an active police officer[3] again, Dr. Lindy stated, "I would say no."

Dr. Hoit, who had recommended spinal stimulation treatment for Mr. Lynn, testified by video deposition that he only expected a "partial" recovery. As he explained, "It doesn't cure whatever the cause of that pain is, but like a pill, like therapy, like an injection, it's another way to kind of cope with the pain that they have and it's an effective one." According to Dr. Hoit, his physical examination was consistent with Mr. Lynn's subjective complaints.

Dr. Howard Katz ("Dr. Katz"), who examined Mr. Lynn upon the request of Mr. Lynn's counsel in June 2019, gave live testimony at trial. Dr. Katz, who has board certifications in physical medicine and rehabilitation, spinal cord injury medicine, and brain injury medicine, testified that Mr. Lynn's pain complaint was that he had low back pain radiating down the backs of his thighs to his knees. According to Dr. Katz, Mr. Lynn complained of an inability to bend down at the waist. Further, Dr. Katz testified that Mr. Lynn had complained of, among other things, that he was having some depression. Dr. Katz related Mr. Lynn's back pain to the motor vehicle accident at issue and testified that, in his opinion, the event from December 2018 was not the reason for the problems Mr. Lynn suffers from today. Dr. Katz observed that Mr. Lynn had complained of all of the same things prior to December 2018 and that, although there was a spike, he was soon "back to where he was." Moreover, Dr. Katz pointed out that Mr. Lynn had "mostly groin pain" contemporaneous to the December 2018 event, not the back pain of which he had been complaining. According to Dr. Katz, "[t]here's no reason to believe that the 2018 injury made him any worse long term." Dr. Katz testified that Mr. Lynn's back pain very well could have caused him to fall in December 2018 and stated that, insofar as causation was concerned, the fall was a "red herring." As he explained, "If you took the fall out you wouldn't know that it happened. He wasn't made worse by the fall, he wasn't made better

---

[3] Although Mr. Lynn was employed by the Shelby County Sherriff's Department as a Deputy Sheriff, he is, at times in this record, referred to as a "police officer."

- 5 -

by the fall. It should not even be considered."

As for the suggestion that Mr. Lynn had made a full recovery prior to the winter of 2018 because he had reported feeling good after physical therapy, Dr. Katz stated that this was not true. He noted that Mr. Lynn had been telling doctors that he was better but still having pain. Dr. Katz specifically noted that Mr. Lynn had two MRIs: one shortly after the May 2017 motor vehicle accident and one in early 2019. According to Dr. Katz, these two MRIs were essentially the same.

Although Dr. Katz testified, contrary to Dr. Hoit, that he did not think Mr. Lynn should have a spinal stimulator, Dr. Katz agreed with Dr. Hoit's opinion that pain would not go away completely even if a spinal stimulator was used. He further indicated that doctors can disagree on whether there is a need for a stimulator.

Dr. Katz found that his observations upon his physical examination of Mr. Lynn were consistent with Mr. Lynn's complaints and Mr. Lynn's records, and he testified that Mr. Lynn "[a]bsolutely" has a permanent injury from the trauma he sustained in May 2017. His testimony further revealed that Mr. Lynn has limitations from that injury and that he will experience pain for the rest of his life, even with the best of care.

As for Mr. Lynn's functional limitations, Dr. Katz opined that Mr. Lynn "should try to exert only 20 pounds of force occasionally, 10 pounds of force frequently, and 5 pounds of force constantly." He testified that Mr. Lynn "can do a light duty job or a sedentary job." When asked if Mr. Lynn was ever going to be able to return to his former job as a police officer and wear a weight belt with 20 to 25 pounds of equipment, he responded, "It's unlikely."

According to Mr. Lynn, he no longer worked for the Sheriff's Department, and he testified that it was "definitely" tough on him not to be able to provide for his family. When asked about the suggestion that his current problems did not really have anything to do with the May 2017 accident, Mr. Lynn responded that he had "been hurting ever since the [May 2017] accident." He testified that he still feels lower back pain and that the pain travels down into his buttocks and the back of his thighs. His testimony indicated, however, that his neck pain had ceased at some point. Although Mr. Lynn testified that he had experienced an increase in pain following an event at his workplace, one that preceded the December 2018 school incident, he did not seek any medical attention following the prior school event. Mr. Lynn's former co-worker, Joshua Green ("Mr. Green"), provided supporting testimony on this point, indicating that he did not know of any medical care that Mr. Lynn had received. As for the later December 2018 event at the school, Mr. Green testified that he did not see any lingering effects from this event, stating that it was "just the same" in regards to Mr. Lynn's appearance before and after the event.

Concerning Mr. Lynn's mental state and mood both before and after the May 2017

- 6 -

motor vehicle accident, Mr. Green testified as follows:

> Before that date he was always out exercising daily, getting his walk in, making people laugh, just being a pleasant person to be around. Afterwards, after the incident happened, you could just tell his mood kind of changed. He was kind of moving a little slower than usual, kind of not really in the best mood, but just trying to put on a happy face just to get through the day, just going through the motions, I guess, of the pain he was dealing with.

In relaying what Mr. Lynn had shared concerning his pain, Mr. Green testified as follows:

> It became difficult for him to bend over sometimes, put on the gear, the duty belt. It became difficult putting it on and walking around the building. He expressed one time it was hard for him to bend and tie his shoes up, just not being able to mobilize. And when I say mobilize, I mean move around as much throughout the building.

According to Mr. Green, Mr. Lynn had to remove his gear belt at times after he came back to work from the May 2017 accident.

Mr. Lynn testified that he started seeing a therapist at the direction of Dr. Katz. The therapist, Rochelle Reyle ("Ms. Reyle"), testified at trial that she first saw Mr. Lynn on September 11, 2019. According to Ms. Reyle, Mr. Lynn's presenting concern was that he was experiencing depressive symptoms, the onset of which started after he was no longer working as a Sheriff's deputy. Mr. Lynn reported to her that he could no longer be a full-duty officer and that no light-duty work was available. She testified that "[h]e felt that [being a deputy] was part of his identity . . . and when he could no longer do that, it changed his mood." She further testified that she met with Mr. Lynn approximately a dozen times and asserted that Mr. Lynn had shared that his position with the Sheriff's Department had been "a dream job that he had since he was a kid."

In describing how Mr. Lynn's depression had affected him in many ways, Ms. Reyle testified in relevant part as follows:

> He reported that he felt depressed or down or sad every day, and he also had difficulty sleeping. He reported that he wanted to isolate himself, did not want to meet up with friends. In fact, when his police friends came around, it made him more depressed. It reminded him of the time he was a police officer.

She testified that Mr. Lynn met the criteria for depressive disorder, and she recommended that he see a psychiatrist for medication. Her testimony indicated that she had not seen anything to suggest that Mr. Lynn was malingering.

Karen Lynn ("Ms. Lynn"), Mr. Lynn's ex-wife,[4] also testified as to changes in Mr. Lynn that had followed the May 2017 incident. Ms. Lynn testified that being a provider was an important part of Mr. Lynn's identity, and she stated that he had been "very proud" of what he was previously doing. Whereas she noted that Mr. Lynn played basketball, ran, and played golf before the May 2017 accident, she testified that he can no longer run without pain and can no longer play basketball. Further, she testified that he can no longer tie his shoes without pain. Ms. Lynn additionally testified that she had observed Mr. Lynn gradually become depressed after the May 2017 accident.

Ms. Lynn further testified that Mr. Lynn was prone to falling and indicated that there had been some falls at their house. Regarding a recent fall, she testified that he reported that his legs gave out on him, and he just slipped and fell. Mr. Lynn had reported the same type of incident, she noted, in connection with the December 2018 event at school.

Proof was also offered at trial regarding Mr. Lynn's loss of earning capacity, and relatedly, testimony was provided as to Mr. Lynn's recent involvement running an Avis franchise.

The jury ultimately returned a verdict for Mr. Lynn in the amount of $615,000.00, but the amount of the verdict soon became a source of contention between the parties. As is relevant to this appeal, Mr. Lynn filed a motion in February 2020 for a new trial or, in the alternative, an additur. Mr. Lynn maintained the jury's award was inadequate, and he requested that the issue be rectified through the granting of a new trial or the suggestion of an additur of at least four times the verdict amount. Although Penske argued against this requested relief, the trial court eventually entered an order suggesting an additur, albeit in the total amount of $685,351.00. Penske ultimately accepted the additur under protest, following which the trial court entered an order formally denying Mr. Lynn's motion for new trial but approving a new total judgment amount of $1,300,351.00 in light of Penske's qualified acceptance of the additur. Now, in the present appeal, Penske challenges the propriety of the additur suggested by the trial court.

## DISCUSSION

"The power of a trial judge to disturb a verdict because of his dissatisfaction with the amount of damages rests in this state on more than a century of precedent and practice." *Foster v. Amcon Int'l, Inc.*, 621 S.W.2d 142, 144 (Tenn. 1981). As this Court recently explained:

---

[4] Despite their divorce, Ms. Lynn testified at trial that she and Mr. Lynn were still together. They had divorced in 1997, but her testimony reflected that they got back together after being separated for just a couple of weeks.

The trial judge serves as a check on the jury's function through his or her role as the "thirteenth juror." *Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 420 (Tenn. 2013). In acting as the thirteenth juror, "the trial judge must independently weigh and review the evidence presented at trial to determine whether it preponderates in favor of the verdict and decide whether he or she agrees with and is satisfied with the jury's verdict." *Id.* (citation omitted). A verdict is not valid if it is not approved by the trial judge acting as the thirteenth juror. *Id.* (citations omitted).

There are a number of ways in which the trial judge can express disapproval when acting as the thirteenth juror. If the judge determines that the verdict is contrary to the weight of the evidence, he or she must grant a new trial. *Turner v. Jordan*, 957 S.W.2d 815, 823 (Tenn. 1997) (citation omitted). However, if the trial judge is solely dissatisfied with the amount of damages awarded by the jury, he or she may suggest an adjustment to the verdict by way of an additur or remittitur. *Id.*

*Walton ex rel. Walton v. Tullahoma HMA, LLC*, 572 S.W.3d 180, 184–85 (Tenn. Ct. App. 2018).

Here, it is the trial court's suggestion of an additur that is at issue. An additur involves an increase to a jury's damages award, *id.* at 185, and pursuant to the governing Tennessee statute, an additur may be suggested by the trial judge "in such amount or amounts as the trial judge deems proper" in cases where, "in the opinion of the trial judge, a jury verdict is not adequate to compensate the plaintiff." Tenn. Code Ann. § 20-10-101(a)(1). As is relevant in this case, the statute permits a defendant to accept a suggested additur under protest and appeal to this Court. *See* Tenn. Code Ann. § 20-10-101(b)(1).

When we review the action of the trial court suggesting an additur, we "us[e] the standard of review provided for in T.R.A.P. 13(d) applicable to decisions of the trial court sitting without a jury." Tenn. Code Ann. § 20-10-101(b)(2). Under the statute, if we are of the opinion "that the verdict of the jury should not have been increased or that the amount of the additur is improper, but that the judgment of the trial court is correct in all other respects, the case shall be reversed to that extent, and [we] may order remitted all or any part of the additur." *Id.* Our role on appeal is "to determine whether the trial court's adjustments were justified, giving due credit to the jury's decision regarding the credibility of the witnesses **and due deference to the trial court's prerogatives as thirteenth juror**." *Long v. Mattingly*, 797 S.W.2d 889, 896 (Tenn. Ct. App. 1990) (emphases added).

Regarding the specific scope of our appellate oversight when entertaining the propriety of a trial court's adjustment to a jury award, prior case law instructs that this Court's review should be guided by the following framework:

First, we examine the reasons for the trial court's action since adjustments are proper only when the court disagrees with the amount of the verdict. *Burlison v. Rose,* 701 S.W.2d at 611. Second, we examine the amount of the suggested adjustment since adjustments that "totally destroy" the jury's verdict are impermissible. *Foster v. Amcon Int'l, Inc.,* 621 S.W.2d at 148; *Guess v. Maury,* 726 S.W.2d 906, 913 (Tenn.Ct.App.1986). Third, we review the proof of damages to determine whether the evidence preponderates against the trial court's adjustment.

*Id.*[5]

Through its presented issues in this appeal and supporting arguments, Penske maintains that each of the foregoing *Long v. Mattingly* prongs is not satisfied. In order to address its concerns, we will address each prong in turn.

*Examination of the Reasons for Additur*

Under the first *Long v. Mattingly* prong, we "examine the reasons for the trial court's action since adjustments are proper only when the court disagrees with the amount of the verdict." *Id.* Indeed, other matters decided by the jury, such as the allocation of liability or fault, are not appropriate for judicial redress by way of an additur. *See Bonner v. Deyo*, No. W2014-00763-COA-R3-CV, 2014 WL 6873058, at *4 (Tenn. Ct. App. Dec. 5, 2014) (noting that when the trial judge's dissatisfaction is only with the amount of the jury award, and not with the allocation of liability or fault, the judge may suggest an additur or remittitur).

On appeal, Penske rightfully acknowledges that the trial court demonstrated disagreement with the amount of the verdict. There is no dispute about that, nor could there reasonably be one. Indeed, in its initial order suggesting additur, the trial court stated that "after independently reviewing and weighing all of the evidence, the court finds that the Jury Verdict is not adequate to compensate the plaintiff in light of the proof, should not be approved as to the awarded total amount of damages, and is subject to additur." Thus, the court determined that the "damages award should be modified." The court's clear motivation for suggesting an adjustment to the jury verdict was its conclusion that the jury's verdict "was inadequate to compensate the plaintiff for losses sustained or will be sustained." Penske, however, maintains that the trial court "went beyond mere dissatisfaction with the jury's award." It somehow divines that the trial court demonstrated disagreement with "facts determined by the jury on Penske's defenses." Respectfully, we

---

[5] Although *Long v. Mattingly* was a remittitur case, its process for reviewing adjustments to the jury's verdict also applies in cases involving additur. *See Tullahoma HMA*, *LLC*, 572 S.W.3d at 186 n.3 (citing past authority for this proposition).

fail to understand Penske's position on this issue.[6]  As it is, the trial court's order is clear. The court suggested an additur simply because it was dissatisfied with the amount of damages awarded to Mr. Lynn.  As we construe the record, the court's action does not admit of anything more or anything less.  As such, the positive adjustment to the jury verdict was entirely appropriate and consistent with what is permitted under Tennessee Code Annotated section 20-10-101(a)(1).

*Examination of the Amount of the Suggested Adjustment*

Under the second *Long v. Mattingly* prong, we shift our attention to the amount of the suggested additur.  "Scrutiny is given to the amount of the suggested additur because adjustments that 'totally destroy' the jury's verdict are impermissible." *Tullahoma HMA, LLC*, 572 S.W.3d at 187.  In the pursuit of exploring this question, the appellate courts have often historically resorted to discussing numerical figures to assess the appropriateness of a suggested additur.  *Id.*  Indeed, as we recently noted, a number of different ratios connected to additurs have withstood appellate review in the past:

> [I]n examining the relation between the amount of the additur and the amount of the jury's verdict, courts invariably quantify the ratio that the resulting judgment bears to the original jury verdict. In *Lynch v. Turner,* No. 01A01-9109-CV-00325, 1992 WL 23122, at *2 (Tenn. App. Feb. 12, 1992) (*no perm. app. filed* ), for example, we noted that "most of the reported cases deal with additurs in the range of one to two times the jury verdict." There, we affirmed a suggested additur even though the resulting judgment was four times larger than the jury's verdict. Similarly, in *Ledford v. French,* No. 02A01-9106-CH-00102, 1992 WL 1144, at *2 (Tenn. App. Jan. 7, 1992) (*no perm. app. filed* ), we affirmed an additur even though the resulting judgment was approximately five times larger than the jury's verdict. And, in *Phillips v. Perot,* No. 02A01-9704-CV-00094, 1998 WL 117325, at *2 (Tenn. App. Mar. 17, 1998) (*no perm. app. filed* ), we affirmed all of the trial court's suggested additurs where the largest additur was roughly five-and-one-half times greater than its corresponding verdict. In each of these cases, we concluded that the amount of the suggested additur did not destroy the verdict's integrity. *Cf. Foster v. Amcon Int'l, Inc.,* 621 S.W.2d 142, 148 (Tenn. 1981) (reversing additur that was thirty times jury's verdict); *Lebovitz v. Bearden,* No. 02A01-9211-CV-00308, 1993 WL 471479, at *4 (Tenn. App. Nov. 16, 1993) (*no perm. app. filed*) (reversing additur that was more than twenty times jury's verdict).

*Id.* (quoting *McKinney v. Smith Cty.*, No. M1998-00074-COA-R3-CV, 1999 WL 1000887,

---

[6] Among other things, we fail to comprehend where the jury made any findings about the specific matters with which, according to Penske, the trial court later supposedly disagreed.

at *5 (Tenn. Ct. App. Nov. 5, 1999)).

Although such results facially "suggest that an additur of around two to four times the jury's verdict would perhaps be permissible and an additur increasing the verdict by a factor of twenty or more would clearly not be," it should be noted that case law "cautions against such mechanical review." *Id.* Indeed, "[m]ere ratios, considered singularly, should not necessarily serve as a proxy for measuring whether the integrity of the jury's verdict is destroyed." *Id.*

There simply is no firm numerical standard that admits of universal application. The appropriateness of a particular additur and resulting additur ratio will inevitably depend on the particular facts of the case, including the amount of base damages at issue. Regarding the uncertainty of additur ratios, one judge has previously offered the following perspective:

> Perhaps the best way to reconcile this case with other similar cases is to place the emphasis on determining whether or not the additur or remittitur would result in an award not only proportionally different from the jury verdict but also substantially different in absolute terms. That is to say, verdicts of relatively small amounts of money might be granted additurs or remittiturs of greater percentages than verdicts of relatively large amounts.

*Phillips v. Perot*, No. 02A01-9704-CV-00094, 1998 WL 117325, at *4 (Tenn. Ct. App. Mar. 17, 1998) (Lanier, Sp. J., concurring).

In attacking the trial court's actions in this case, Penske has contended, among its other arguments, that we "should review the disproportionate nature of each item of damages for which the [trial court] suggested additur." To the extent Penske invites this Court to examine the proportionality of adjustments made with respect to individual categories of damages, its arguments are misplaced. We have previously observed that "Tennessee courts do not analyze award adjustments by the type of damages awarded." *Bonner*, 2014 WL 6873058, at *8. Indeed, "[r]ather than analyzing each type of damages in a vacuum, this Court has typically considered whether the overall verdict was destroyed by the additur." *Id.* In this case, therefore, we must answer the following question with respect to this *Long v. Mattingly* prong: did the trial court's suggested additur in the amount of $685,351.00 destroy the jury's verdict? Although Penske generally argues that we should answer this question in the affirmative, we are of the opinion that it would not be appropriate to do so. In our view, the suggested additur which was accepted by Penske under protest did not destroy the integrity of the jury's $615,000.00 verdict.

Whereas Penske suggests that cases involving "relatively large" verdicts might deserve greater scrutiny even when there is a lower additur ratio present and cites to this Court's decision in the *Tullahoma HMA* case in an attempt to establish that the additur here

- 12 -

is similarly invalid to the one that this Court found deficient in that case, we do not reach the same conclusion that Penske does on this issue. In *Tullahoma HMA*, we disapproved an additur involving an approximate four-and-one-half fold increase and distinguished previous cases which had approved similar proportional increases by noting that they had involved adjustments of relatively lower absolute amounts. *Tullahoma HMA, LLC*, 572 S.W.3d at 188. Here, although it is true that the underlying verdict is also more substantial in absolute terms than the prior verdicts this Court had surveyed in *Tullahoma HMA*, the proportional increase involved in the present matter is appreciably *lower* than the proportional adjustment we rejected in *Tullahoma HMA*. Indeed, whereas the increase in the verdict at issue in *Tullahoma HMA* was by a factor of over 4.5, the increase at issue here is by an approximate factor of 2.

Unlike our characterization of the resulting judgment in *Tullahoma HMA* after the suggested additur, we cannot conclude that the judgment after the additur in the present case was "of a different ilk" and bore "no meaningful relationship" to the original jury verdict. *Id.* The trial court responded to the inadequacy it perceived to exist in the amount of the verdict returned by the jury and proposed that Mr. Lynn be awarded meaningful additional relief to appropriately compensate him by way of the suggested additur. The involved adjustment did not, however, totally destroy the jury's verdict.

*Examination of Whether the Evidence Preponderates Against the Adjustment*

To conclude our analysis under the *Long v. Mattingly* framework, we review whether the evidence at trial preponderates against the trial court's adjustment. For the reasons that follow, we conclude that it does not.

The trial court suggested adjustments to three specific categories of damages in its initial order suggesting additur. The court proposed that damages for future loss of enjoyment of life be increased by $75,000.00, from $6,000.00 to $81,000.00. (TR 761) Regarding damages for future physical pain and mental suffering, the court suggested an adjustment that would bring damages from $0.00 to $300,000.00. With respect to damages for Mr. Lynn's loss of earning capacity, the court suggested an additur of $310,351.00, increasing the award from $120,000.00 to $430,351.00.

Each of these adjustments is supported by the proof presented at trial. We turn first to the trial court's adjustment regarding Mr. Lynn's future loss of enjoyment of life. "Damages for loss of enjoyment of life compensate the injured person for the limitations placed on his or her ability to enjoy the pleasures and amenities of life." *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 715–16 (Tenn. Ct. App. 1999) Although this type of damage relates to daily life activities that are common to most people, it can also compensate a plaintiff for the loss of uncommon individual pursuits or talents. *Id.* at 716. "The policy underlying the award of loss of enjoyment damages is of making the victim whole in the only way a court can—with an equivalent in money for each loss suffered." *Id.*

Here, whereas the jury awarded $75,000.00 for past loss of enjoyment of life, it only awarded $6,000.00 for future loss of enjoyment of life. The trial court agreed with Mr. Lynn's position that the $6,000.00 award was "low," and it determined that an increase in the total award to $81,000.00 was appropriate. In making its decision, the trial court noted that Mr. Lynn "is no longer working the job he planned to retire from and is no longer involved in sports or family activities as he did in the past." The record provides significant support for the trial court's recognition that Mr. Lynn has experienced a marked decrease in his ability to enjoy the pleasures of life and that he will continue to do so in the future. Among other things, Mr. Lynn's ex-wife testified that although Mr. Lynn played basketball, ran, and played golf before the May 2017 accident, he can no longer run without pain and can no longer play basketball. It should also be noted, however, that the trial court's decision to suggest a total award of $81,000.00 for this component of damages was itself a measured recognition of evidence that "with surgery and time, [Mr. Lynn] should gain some relief" and therefore have a "greater ability to enjoy life." Considering the record as a whole, the evidence does not preponderate against the trial court's determination regarding this suggested adjustment.

We likewise conclude that the evidence presented at trial does not preponderate against a determination that Mr. Lynn should receive $300,000.00 for future pain and suffering. The record is replete with evidence that Mr. Lynn will never completely recover from his injuries and that he will continue to endure significant pain as a consequence from the May 2017 accident. Indeed, to summarize the general picture that was painted through the accounts of the physicians who testified: Mr. Lynn was a forthright patient whose complaints of pain were consistent with physical examinations of him; Mr. Lynn's problems were causally related to the May 2017 motor vehicle accident; and Mr. Lynn would have pain for the rest of his life, even with the best of medical care. The trial court accredited these accounts in its order suggesting additur, noting that Mr. Lynn has a permanent injury and will continue to be in pain. The trial court also highlighted the jury's award to Mr. Lynn of $134,000.00 for future medical expenses.

It should also be noted that pain and suffering "encompasses the physical and mental discomfort caused by an injury," and, as to the latter concern, extends to a variety of emotional responses, including "anguish, distress, fear, humiliation, grief, shame, or worry." *Overstreet*, 4 S.W.3d at 715. The mental suffering that accompanies an injury is accordingly compensable through damages for pain and suffering, *Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 420 (Tenn. 2013), and as we detailed earlier in this Opinion, a breadth of evidence was offered at trial showing that Mr. Lynn experiences significant negative emotions as a result of his injuries and accompanying limitations. His therapist, for instance, diagnosed him with a depressive disorder and testified that she sees him "just about' every week.

The evidence does not preponderate against the trial court's determination that Mr. Lynn will continue to experience significant pain and suffering, and it should be noted that

- 14 -

the trial court's findings on damages were, similar to its discussion of Mr. Lynn's future loss of enjoyment of life, tempered by the evidence that some of Mr. Lynn's physical pain could subside with surgery. Of course, the potential prospect of *some* relief to Mr. Lynn in no way establishes that the entirety of his pain and suffering will be eliminated. Indeed, according to Dr. Katz's testimony, Mr. Lynn will experience pain for the rest of his life, even with the best of care. Moreover, Dr. Hoit testified that he only expected a "partial" recovery. In light of all of the evidence presented at trial which pointed to ongoing pain and suffering by Mr. Lynn even with the best of medical care,[7] we find no reversible error with respect to the trial court's suggestion of adjustment.

The evidence also does not preponderate against the trial court's suggested adjustment regarding Mr. Lynn's damages for loss of earning capacity. Interestingly, Penske devotes much of its appellate argument on this issue in an attempt to undermine witnesses called by Mr. Lynn at trial, notwithstanding the fact that the trial court specifically accepted the calculations of Penske's own expert, forensic economist Parker Cashdollar ("Mr. Cashdollar"). Indeed, the trial court concluded that there was "some misinformation in the calculations" of Mr. Lynn's expert due to some omitted information.

The trial court's adjustment to loss of earning capacity damages in the amount of $310,351.00 brought the total award to $430,351.00. This decision was in alignment with testimony offered by Penske's own economic expert, Mr. Cashdollar, who the court observed had set the loss of earning capacity "at between $336,817 and $430,351." Penske criticizes this specific reliance on its expert by arguing that Mr. Cashdollar opined that his calculations ranged from $0 to $776,016.00. Although it is true that Mr. Cashdollar offered a range of figures in connection with his testimony, the trial court clearly accredited one of the specific opinions that was offered. Indeed, during his testimony at trial, Mr. Cashdollar presented one scenario, which the trial court highlighted, under which Mr. Lynn's loss of earning capacity was calculated between $336,817.00 and $430,351.00. A trial court is free to believe or disbelieve all or part of offered testimony when sitting as the thirteenth juror, *Borne v. Celadon Trucking Servs., Inc.*, 532 S.W.3d 274, 317 (Tenn. 2017), and when conducting our review of a trial court's suggested adjustment, we, among other things, are to give "<u>due deference to the trial court's prerogatives as thirteenth juror</u>." *Long*, 797 S.W.2d at 896 (emphasis added). Here, the court simply found favor in a specific assessment offered by one of Penske's experts on this element of damages. Taking this determination into account as part of our review, we cannot say that the evidence preponderates against the suggested adjustment to Mr. Lynn's loss of earning capacity damages.

---

[7] It should be noted that counsel for Penske even stated at oral argument that his client has never asserted that Mr. Lynn fully recovered from the May 2017 accident and injury. Moreover, counsel additionally stated that his client had never suggested that prior physical therapy completely cured Mr. Lynn.

**CONCLUSION**

The record indicates that the trial court suggested an additur due to its disagreement with the amount of the jury's verdict. Because we conclude that the suggested additur did not destroy the jury's verdict, and based upon our conclusion that we cannot say that the evidence preponderates against the amount of the new judgment, the action of the trial court is affirmed.

s/ Arnold B. Goldin
ARNOLD B. GOLDIN, JUDGE